UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| LORI L. CAMERON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:14cv42 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant
Commissioner of Social Security Administration denying Plaintiff's application for Disability
Insurance Benefits (DIB) and Supplemental Security Income (SSI) as provided for in the Social
Security Act. 42 U.S.C. §416(I). Section 205(g) of the Act provides, <u>inter alia</u>, "[a]s part of his
answer, the [Commissioner] shall file a certified copy of the transcript of the record including the
evidence upon which the findings and decision complained of are based. The court shall have
the power to enter, upon the pleadings and transcript of the record, a judgment affirming,
modifying, or reversing the decision of the [Commissioner], with or without remanding the case
for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if
supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an
"inability to engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to last for a continuous period of not less
than 12 months. . . ." 42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A). A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act

through June 30, 2007.

2.      The claimant has not engaged in substantial gainful activity since October 31, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; impingement syndrome in the right hip; right knee osteophytes; left eye blindness; and obesity; however, the evidence did not establish any severe impairments prior to the date last insured (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) and can lift up to 20 pounds occasionally and ten pounds frequently; in an eight-hour work day can sit for approximately six hours and can stand and walk in combination for approximately six hours; can never crawl or climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs, balance, stoop, crouch and kneel; due to vision loss in her left eye can have no exposure to unprotected heights, commercial driving or hazardous machinery.

6.      The claimant does not have any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on February 28, 1971, and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2004, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-24).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on September 16, 2014. On December 22, 2014, the defendant filed a memorandum in support of the Commissioner's decision, and on March 12, 2015, Plaintiff filed her reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984). From the nature

of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff was born on February 28, 1971 and has completed the ninth grade. Plaintiff alleged the following medical impairments: degenerative arthritis in both hips; multilevel degenerative disc disease in the lumbar spine; arthritis in both knees; defective medial meniscus in the right knee; mild facet arthropathy at L4-L5; small left paracentral disc protrusion superimposed and mild diffuse ridge-fault complex at L5-S1; labral tear in the right hip with an acetabular impingement; plantar fasciitis in both heels; otitis externa and otitis media in both ears; chronic left ear drainage; chronic tympanic membrane perforation in the left ear; chronic pain syndrome; obesity; Stickler's syndrome; localized rhegmatogenous retinal detachment with lattice degeneration; post scleral buckle implantation with cryoretinopexy of the right eye; and major depression.

The medical evidence is as follows: Plaintiff's primary treating physician, Dr. David Reinhard, ordered a number of x-rays, CT scans, and MRI's over the nearly five years that he treated Plaintiff. In July of 2007 a bilateral hip x-ray was performed which showed stable appearance of the pelvis with mild degenerative changes in the left hip. (Tr. 376) On the same day, an MRI of the right hip was done which showed stable appearance of the hip with mild joint space narrowing. (Tr. 366) An MRI of the right hip in September of 2008 was negative, but an osseous protuberance of the femoral head and neck junction bilaterally may predispose her to CAM type femoral acetabular impingement. (Tr. 375) An x-ray of the pelvis in October of 2008 showed osteoarthritic changes asymmetrically involving the right hip greater than the left. (Tr. 374) An x-ray of the right hip in October of 2008 showed osteoarthritis in the right hip. (Tr. 373) In July of 2010 an x-ray of the thoracic spine was negative. (Tr. 372) In August of 2010 an x-ray

of the lumbar spine showed multilevel degenerative disc disease. (Tr. 369)

In October of 2010 an x-ray of both knees showed mild degenerative changes in the right patellofemoral joint. (Tr. 368) In October of 2010 a CT scan of the neck was negative. (Tr. 367) In October of 2010 an MRI was done of the right knee which showed a defect in the midposterior limb of the medial meniscus, cartilage thinning and irregularity of medial femoral condyle and lateral facet of the patella, degenerative osteophytes of the patellofemoral joint, and possible small intra-articular loose body medial femorotibial joint compartment. (Tr. 364)

An MRI of the lumbar spine done in April of 2007 showed mild facet arthropathy at L4-L5 and a small left paracentral disc protrusion superimposed in a mild diffuse ridge-vault complex at L5-S1. (Tr. 362) Follow-up MRI of the lumbar spine done in January of 2012 showed no significant change since the previous MRI. (Tr. 476)

Dr. Reinhard also saw Plaintiff in his office for various medical problems. In July of 2007, Plaintiff visited Dr. Reinhard for bilateral hip pain which she had reported was going on to some degree for 10 years; however, recently it had become worse. (Tr. 342) Plaintiff had tried Naproxen which no longer helped. (Id.) Plaintiff reported that the pain became very severe, and at times it reached a level of 10 out of 10. (Id.) Plaintiff reported some back pain, but indicated that it was not severe. (Id.) On physical exam Plaintiff had quite a bit of tenderness in the anterior hip when it was rotated out, and the muscles felt fairly tight over the area. (Id.) Dr. Reinhard's opinion was probable arthritis in the hips, and an x-ray was ordered along with Mobic and Vicodin if needed. (Id.)

Plaintiff was seen three months later reporting continuing pain in the hips which had improved. (Tr. 341) She was also getting a burning sensation down into her buttocks and down

the back of her leg. (Id.) She was 64 inches tall and weighed 218 pounds. (Id.) Plaintiff was given Flexeril with a warning that it may make her drowsy. (Id.) She was not seen again until April of 2008, and she reported that Effexor XR 225 mg. daily was controlling her depression and anxiety. (Tr. 338) Plaintiff occasionally took Vicodin and Mobic for her hip pain. (Id.) She reported that she was in a great deal of pain when she had to stand for a long period of time. (Id.) Plaintiff reported that her ankles had also been giving her pain, but there was no swelling. (Id.)

Plaintiff was seen four months later, and she was having very bad hip and groin pain on the right. (Tr. 337) She was now taking Soma 350 mg. three times a day; Mobic 7.5 mg. a day; and Vicodin 5/500 usually about four times a day. (Id.) She continued to take Effexor XR. (Id.) Plaintiff was doing well with the hip, but it was very hard for her to flex and extend the hip (Id.) Dr. Reinhard found that she was not likely to respond well to physical therapy. (Id.)

Plaintiff was seen about two weeks later, and she reported pain in the middle and first three toes of each foot. (Tr. 336) She reported that she could hardly walk on her feet, and she still had quite a bit of pain in her hip. (Id.) There was also tenderness in her lumbosacral area on the right. (Id.) On physical exam she had muscle strength in the lower extremities, and her deep tender reflexes were slightly decreased in the ankle joints. (Id.) She was taking four Vicodin daily without any relief. (Id.) Dr. Reinhard suspected a neurologic origin to her problems with walking on her feet. (Id.) He ordered a new prescription of Lyrica, 100 mg. daily, and he changed her Vicodin to Percocet. (Id.)

Plaintiff was seen two months later, and she had been cleared for hip surgery. (Tr. 335) She had a labral tear in the right hip with an acetabular impingement. (Id.) Dr. Wright was going to do surgery in about a week. (Id.)

In January of 2009 Plaintiff continued on Effexor XR 150 plus 75 daily, Vicodin 5/500 as needed for hip pain, Mobic 7.5 mg. daily as needed, and Soma 350 mg. three times a day as needed. (Id.) Dr. Reinhard diagnosed Plaintiff with chronic hip pain and depression which was well controlled. (Id.)

About two months later Plaintiff saw Dr. Reinhard with a rash which was fairly deep on the feet and legs. (Id.) She thought it was from Lyrica, and she was prescribed Neurontin 300 mg. per day. (Id.) Dr. Reinhard changed Plaintiff's Vicodin prescription to Lortab. (Id.) Plaintiff was also seen for problems with chronic hip and some lower back pain. (Tr. 332) She was tender in the lumbosacral area. (Id.) She reported that the Vicodin and Naproxen were not helping. (Id.) Plaintiff wanted to go back to the Vicodin and Mobic. (Id.) Dr. Reinhard found a couple fresh nodular areas which might have been an allergic reaction. (Id.) In July of 2009, Plaintiff reported that her Effexor XR was not working as she was still very sad at times and her mind did not want to shut off at night. (Tr. 330) Although she did not have any suicidal thoughts, she did have thoughts of some low self-esteem and worthlessness. (Id.) Plaintiff reported that she had a lot of anxiety. (Id.) Plaintiff also reported that her left ear hurt. (Id.) On physical exam there was some debris in her ear canal. (Id.) She was given some Xanax for anxiety, but she was told that she could not use it on a daily basis. (Id.)

Plaintiff saw Dr. Reinhard again in August of 2009, and she reported that her depression was helped quite a bit by Abilify, but her rash was not better. (Id.) Dr. Reinhard thought the rash could be a bacterial infection. (Id.) Plaintiff was seen again in September of 2009 for itchiness especially in the anterior legs and on the hands. (Tr. 327)

Plaintiff was not seen again until March of 2010, and she had been somewhat depressed

over the death of her boyfriend. (Tr. 326) Her Effexor and Abilify seem to be helping her, and she had no suicidal thoughts or ideations. (Id.) She had gained thirteen pounds since September and now weighed 211 pounds. (Id.)

In April of 2010 Plaintiff told Dr Reinhard that her Effexor was working for her depression, but she had been very sad about the death of her boyfriend. (Tr. 325) In May of 2010 she reported being on Abilify and Pristiq for her depression which had helped significantly. (Tr. 324) Plaintiff had run out of those medications before her appointment, but she had no suicidal thoughts or ideations. (Id.)

In June of 2010 Plaintiff saw Dr. Reinhard for a check-up for a burn for which she had gone to the emergency room. (Tr. 323) Later in June of 2010 she saw Dr. Reinhard and talked about Xanax which she had tried to stop taking over the last month, but that did not go well. (Tr. 322) Plaintiff's blood pressure was way up. (Id.) She reported that she needed something to help calm her down as her mom has dementia which is getting worse. (Id.) Dr. Reinhard continued Xanax, and he urged Plaintiff to talk to her psychiatrist about Abilify. (Id.) Plaintiff was seen again in July of 2010 for depression and anxiety as the Xanax and Pristiq was not helping with the depression. (Id.) The doctor prescribed Cymbalta 30 mg. daily for two weeks and then 60mg daily thereafter (Id.)

Plaintiff was seen by Dr. Reinhard in August of 2010 for low back pain that went down her legs. (Tr. 320) She had tenderness across the low back, but no decreased strength in the lower extremities. (Id.) Plaintiff was seen again in October of 2010 because she fell on her right knee about a month ago, and the knee was very painful. (Tr. 319) The left knee was also bothering her. (Id.) She also noticed that the right foot was starting to turn out a little, and she thought this was

due to her problems with the hip. (Id.) On physical exam Plaintiff weighed 226 pounds. (Id.) She was having some problems with her neck, and Dr. Reinhard thought it was due to scar tissue from her tracheotomy that she had as a baby. (Id.) Dr. Reinhard thought that her therapy for depression would be very helpful to her. (Id.) Plaintiff was seen a week later with low back pain, and on physical exam she was tender in the lower spinal area. (Id.)

In November of 2010 Plaintiff saw Dr. Reinhard for episodes of high blood pressure and pulse which dropped and heart fluttering. (Tr. 318) Plaintiff thought it was just that she forgot her anxiety medicine one day last week. (Id.) On physical exam she was fine. (Id.) Later Plaintiff was seen for a follow up to an ER visit due to PVCs and palpitations. (Tr. 317) Dr. Reinhard thought she was doing well, but was gaining some weight which was a concern.

Plaintiff was next seen in February of 2011 for a bilateral heel pain especially when she gets up in the morning or gets up after having been sitting for a long time. (Tr. 316) She also had some right knee pain. (Id.) On physical exam she had severe right knee pain with effusion on the anterior part of the knee. (Id.) The knee was stable and not warm or hot. (Id.) Dr. Reinhard thought that the heel pain was probably plantar fasciitis, and he recommended exercises. (Id.) Dr. Reinhard wanted to check the right knee pain with an MRI because of the effusion and because Plaintiff was getting quite a bit of pain in the lateral part of the knee joint. (Id.) Plaintiff also reported increased snoring and choking sensation when she sleeps, and Dr. Reinhard wanted to order a sleep study. (Id.)

Plaintiff was seen by Dr. Reinhard again in April of 2011 with pain in the left ear that had still not healed up. (Tr. 315) On physical exam the right tympanic membrane was normal, but the left showed yellow liquid. (Id.) Dr. Reinhard diagnosed otitis externa and probable otitis media.

(Id.) Dr. Reinhard noted that Plaintiff was seeing a psychiatrist, but she felt she was well controlled. (Id.) Dr. Reinhard thought Plaintiff was quite stable at that time. (Id.) Plaintiff was seen again in April of 2011 for bad leg pain, and she had been in the emergency room because her legs had hurt so badly. (Id.) She was having some shortness of breath. (Id.) She continued to have a chronic recurrent problem with left ear drainage. (Id.) On physical exam, Plaintiff had a pattern of pain down the legs which appeared radicular as it started in the buttock and went down the leg. (Id.) She had discomfort in the knee areas bilaterally. (Id.) The left ear showed chronic tympanic membrane perforation with quite a bit of yellow drainage. (Id.) Plaintiff was referred to Dr. Cummiskey for her knee problem. (Id.)

Plaintiff was seen again in August of 2011, and her legs and back were worse, and she was out of Lyrica because she could not afford the medicine. (Tr. 461) Plaintiff reported she had eye surgery on June 28, and she was doing better. (Id.) Plaintiff reported that she was at a point where she could hardly clean her house without getting completely exhausted and having to stop. (Id.) She weighed 255 pounds. (Id.) There was tenderness in the low back on physical exam which was normal for her. (Id.) Dr. Reinhard also found decreased strength in the lower extremities with trying to raise the legs off the table. (Id.) There was point tenderness along the calves and the legs and also some fibromyalgia pain as well. (Id.)

Plaintiff was seen by Dr. Reinhard again in August, and her hip and back pain had continued to worsen. (Id.) The doctor noted that she had severe arthritis which was causing quite a bit of pain for her. (Id.) The leg pain was worse and she had run out of Lyrica. (Id.) She also became less active because of her severe pain. (Id.) Plaintiff was currently on Cymbalta, Percocet, Soma, and Lyrica. (Id.) On physical exam she had some weakness in the lower extremities, and

when trying to raise the thighs off the table or to extend the knees against resistance, she had trouble doing that because of decreased strength. (Id.) She walked with an antalgic gait because of the hip pain, and her x-rays showed degenerative disease in the hips and some focal disc protrusion in the lumbosacral spine. (Id.) However, Dr. Reinhard found that because of Plaintiff's marked impairment and her lack of mobility, she had a tendency to gain weight which was making her worse to the point that she could hardly get around anymore at all. (Id.) Dr. Reinhard found that she could not sit or stand for over fifteen to twenty minutes at a time, and he found that it would be extremely difficult for her to hold down any meaningful employment. (Id.)

Plaintiff was seen again in January of 2012 with problems in the left ear and pain in her hips, back, and knees. (Tr. 487) On physical exam she was very tender in the lower back, and had quite a bit of achiness in the knees. (Id.) Her strength was quite a bit decreased because when she tried to do any movement against resistance, her back hurt. (Id.) The left tympanic membrane showed chronic changes with a little bit of fluid in the canal, but no obvious perforation. (Id.)

Plaintiff was seen about a week later for a disability evaluation. (Id.) She brought a list detailing her symptoms, and quite a few of the symptoms go along with her history of osteoarthritis in the spine, hips, and knees which Dr. Reinhard found to be a big source of her problems for which there is not much treatment available because pain was diffuse allowing only for treatment with pain medication. (Id.) Dr. Reinhard noted that Plaintiff had gotten to the point where she could not stand for over thirty minutes without having to sit down in a chair with a reclining back. (Id.) He found that if Plaintiff sits in a straight back chair she gets severe pain again and the whole cycle repeats. (Id.) Dr. Reinhard found that this precluded her from any kind of effective employment. (Id.) Plaintiff reported new pain in the medial part of the right knee

which is over the PES anserine area which could be bursitis. (Id.) Dr. Reinhard was going to prescribe an anti-inflammatory for that. (Id.) Also new was tenderness in the thenar eminence of her right hand which he believed to be tendonitis. (Id.) Dr. Reinhard also found a little bit of decreased strength in the thumb and quite a bit of pain up through the left index finger and into the left second metacarpal which was probably arthritis though it was not yet documented on x-ray. (Id.) Plaintiff had also been having quite a bit paresthesia and pain in the feet, and Dr. Reinhard was going to check her glycohemoglobin. (Id.)

Plaintiff was seen by Dr. Reinhard again in April of 2012 for chest pain, fatigue, sweating, and chills. (Tr. 486) She was seen a month later and she weighed 215 pounds.(Tr. 485) Plaintiff asked Dr. Reinhard if she could try something different for her hand pain, and he changed her medication from Mobic to Naproxen. (Id.)

Plaintiff also saw Dr. Richard Isrussi from January 12, 2010 through April 11, 2012. In January of 2010 she was seen for the first time for low back pain into both lower extremities. (Tr. 401) She reported pain for 20+ years with an increase over the past one year. (Id.) The pain was described as achy, nagging, sharp shooting, and burning pain. (Id.) Plaintiff's pain was rated at a 2 at rest, but 6 to 9 when aggravated with walking or standing. (Id.) Pain was relieved by rest and medications. (Id.) Plaintiff's sleep was disturbed. (Id.) Presently, she was on Lyrica 50 mg., Mobic 7.5 mg., Vicodin 5/500, Xanax, and Soma. (Id.) On physical exam Plaintiff had reduced range of motion in flexion of the lumbar spine, and her gait was antalgic. (Id.) Her muscle and strength and tone was 4+. (Id.) She had a positive straight leg raise on both the left and right. (Id.) Dr. Isrussi  noted x-rays showing osteoarthritis of the right hip and the MRI/CT scans. (Id.) His diagnosis was chronic pain syndrome, osteoarthritis, and impingement syndrome. (Tr. 402) He

placed her on Percocet, increased her Lyrica, and continued with Soma. (Id.) Dr. Isrussi noted that Plaintiff had been advised to have hip surgery on the right, but she declined because of her family situation. (Id.) Plaintiff was seen a month later, and her pain had decreased to the level of 4 from 7, and her symptoms and physical exam were the same. (Id.) Her pain medications were unchanged. (Id.) Plaintiff was seen three months later and there were no changes. (Tr. 399) She was seen two months later, and her pain decreased slightly to the level of 3 without any other changes. (Tr. 398) Plaintiff was seen three months later, and her pain had increased without any other changes. (Tr. 397) Her Percocet was increased. (Id.) Plaintiff was next seen in February of 2011, and her pain had decreased to the level of 6 from 8. (Tr. 396) She was otherwise unchanged, and her Percocet was changed. (Id.) There were no changes in her condition. (Tr. 395) Her Neurontin was changed to Lyrica because of dizziness (Id.) Plaintiff was seen three months later without any changes. (Tr. 394) She was seen two months later with increased pain, but otherwise she was unchanged. (Tr. 464) Her medication was changed to Methadone. (Id.) Plaintiff was next seen in February of 2012, and her pain had increased. (Tr. 484) Her Vicodin was changed to OxyContin. (Id.) She was seen in April of 2012, and her pain was increased without any other changes. (Tr. 483)

Plaintiff was also seen at the Centers for Pain relief on June 4, 2012 and July 3, 2012.  In June of 2012 Plaintiff was seen by Helen Robertson, a nurse practitioner. (Tr. 493) Her primary pain location was in her lower back with pain down both of the legs. (Id.) Plaintiff reported that the pain was 10 on a 1 to 10 scale presently, and she described the pain as burning, sharp, stabbing, throbbing, aching, and spasms. (Id.) Her pain was constant throughout the day with varying levels of severity. (Id.) The pain was decreased by prescription medications, and it was

aggravated by prolonged sitting, standing, and walking. (Id.) Plaintiff also reported pain in both knees which was an 8 on a 1 to 10 scale presently. (Id.) She reported that the pain gets as bad as 10. (Id.) Plaintiff described the pain as sharp, shooting, and aching which is constant throughout the day with varying levels of severity. (Id.) Additionally, she reported pain in the neck which radiates bilaterally down her arms, and the pain was a 5 on a 1 to 10 scale presently. (Id.) The pain was decreased by prescription medications. (Id.)

On physical exam Plaintiff's strength was normal. (Tr. 494) On cervical exam she had the following positive signs: Spurling's test, left and right; right cervical facet loading bilaterally; cervical facet tenderness bilaterally; and cerviothoracic mild myofascial tenderness painful with range of motion. (Id.) Plaintiff had the following positive signs on lumbar spine exam: pain with extension and flexion; sacroiliac joint tenderness; lumbar facet tenderness bilaterally; lumbar facet loading bilaterally; pelvic obliquity; and myofascial tenderness. (Id.) There were positive signs on examination of her knees, including the following: crepitus bilaterally, and joint point tenderness bilaterally with range of motion limited. (Id.) The diagnosis was radiculopathy, lumbar/thoracic, lumbar spondylosis/arthropathy; sacroiliitis; and cervical radiculopathy. (Id.)

Plaintiff was seen again by Ms. Robertson a month later. (Tr. 490) Plaintiff's low back pain was a 2 on this visit, but otherwise the descriptions were the same. (Id.) The knee pain was a 4 on this visit, but otherwise it was the same. (Id.) Plaintiff's neck pain was the same at level 5. (Id.) A urine drug screen was taken which confirmed that she was taking Methadone and Vicodin. (Id.) Plaintiff's physical exam results were similar for the first, and the diagnoses were the same. (Tr. 491)

Plaintiff was seen at the Bowen Center from March 2, 2006 through August 11, 2011. In

March of 2006 she was seen by Dr. Larry Wooley because of a very severe and long period of major depression. (Tr. 292) Plaintiff displayed depressed mood, sad affect, fearfulness, and reported numerous signs of depression, including loss of energy, lethargy, and hypersomnia. (Id.) She had gained approximately 90 pounds in the last six months as she was using food to nurture herself. (Id.) Plaintiff admitted to recent suicidal ideation. (Id.) She reported that she had the severe depression since about 2002 following the cognitive and physical decline of her father's health and eventual death. (Id.) Plaintiff had been previously treated at the Bowen Center in 2003 for similar issues. (Id.) The diagnosis was major depressive disorder, single episode, severe. (Tr. 293) It was also thought that she had some unresolved bereavement issues related to the death of her father. (Id.) Plaintiff received seven sessions of therapy from mid-March of 2006 to mid-June of 2006. (Tr. 301-305).

Plaintiff next returned to the Bowen Center in August of 2010 when she was living with her 17-year-old daughter and mother who had Alzheimer's for whom she provided care. (Tr. 306) She reported that her mind never stops, and she is unable to grab a thought. (Id.) When Plaintiff was on Abilify for four or five months, these problems were stopped and she was able to sleep. (Id.) Plaintiff reported an inability to shut off her thoughts at night and reported suffering from depression for about 10 years. (Id.) She did utilize some breathing exercises, but she really had no time due to the care of her mother. (Id.) Plaintiff also experienced the death of her fiancé in January. (Id.) She reported that she does have friends but she does not get out much. (Tr. 307) She also reported some hearing loss, and questions had to be repeated to her. (Id.) Plaintiff was diagnosed with major depressive disorder, recurrent, moderate without psychotic features. (Tr. 309) Her GAF was rated at 50-55. (Id.) She received outpatient treatment on seven occasions up

through February of 2011. (Tr. 295-299 and 311-312)

In August of 2011, Plaintiff was evaluated by Dr. H. Ahmad for a disability evaluation. (Tr.411) She told the doctor that she had struggled with recurrent depression all her life, but sometimes the depression got better. (Id.) When the depression is worse, she feels very sad and withdrawn and isolated. (Id.) She cries easily and gets overwhelmed easily. (Id.) During these times she has decreased interest in hobbies as well as poor attention and concentration. (Id.) Her depression has been much better since she started Cymbalta. (Id.) She also has an anxiety problem where she experiences panic attacks when she gets overwhelmed. (Id.) During the panic attacks she is overwhelmed with anxiety along with physiological symptoms. (Id.) Plaintiff had never had any psychiatric hospitalizations or any history of overdose attempt or cutting herself. (Id.) Her mental status exam was normal. (Tr. 412-414) She was diagnosed with major depressive disorder, recurrent, moderate, without psychotic features, currently in remission with medication and panic disorder without agoraphobia. (Id.) Plaintiff's GAF was rated at 50-70. (Tr. 414) Dr. Ahmad found that Plaintiff was mentally stable, and her depression and panic attacks seemed to be stable and under control. (Tr. 415)

Plaintiff saw Dr. Anh-Danh Phan on June 24, 2011. Plaintiff told Dr. Phan that she had no recent eye trauma, but she had a past ocular history of rhegmatogenous retinal detachment of both eyes, status post scleral buckle implantation with cryoretinopexy of the right eye performed at eleven years old and status post retinal surgery two times in the left eye performed at nine years old with chronic poor vision of left eye; as well as high myopia. (Tr. 378) Clinical findings included visual acuity corrected in the right eye 20/25. (Id.) Dr. Phan diagnosed probable Stickler's syndrome; localized rhegmatogenous retinal detachment with lattice degeneration; and

post scleral buckle implantation with cryoretinopexy of the right eye. (Id.) Dr. Phan recommended that Plaintiff proceed with laser retinopexy of the right eye which was performed on that day. (Id.)

Plaintiff saw Dr. Donna Unversaw on August 16, 2011, Dr. Unversaw found that Plaintiff had no severe mental impairment based primarily on the report of Dr. Ahmad regarding the SSI claim. (Tr. 428) Dr. Unversaw found that there was lack of substantial evidence for the time period covered by her DIB to make a determination. (Tr. 442)   On November 1, 2011. Dr. F. Kladder reviewed the evidence in the file and the assessment of Dr. Unversaw, and it was affirmed as written on both parts. (Tr. 467)

On August 17, 2011, Plaintiff saw Dr. H. Bacchus.  Plaintiff told the doctor that she can see light and dark with her left eye, but is unable to make out objects or faces. (Tr. 444) She drives a car with restrictions. (Id.) She also reported struggling with depression. (Id.) Physically, Plaintiff reported that she can sit and stand about 10 to 15 minutes, walk five minutes, and lift five pounds. (Id.) On physical examination the doctor was unable to visualize the fundus on the left. (Tr. 445) Plaintiff was able to see light and dark, but unable to visualize the doctor's fingers at 10 inches. (Id.) An examination of Plaintiff's low back showed tenderness to palpitation and a range of motion in the lumbosacral spine and bilateral hips. (Id.) She had reduced range of motion in the lumbar spine, cervical spine, both knees, and hips. (Tr. 447) Plaintiff's gait was antalgic, but her station was erect. (Id.) She had no assistive device. (Id.) She was able to walk on heels, toes, tandem walk, and squat one-half the way down. She was unable to hop secondary to knee and hip pain. (Id.) There was tenderness to palpitation in range of motion in the bilateral knees with mild crepitus in the right knee. (Id.) Plaintiff's gait was steady and sustainable. (Id.) Her muscle strength and grip strength was normal bilaterally. (Id.) Plaintiff's fine and gross dexterity

was intact to button, zip, and pick small objects. (Id.) Dr. Bacchus diagnosed a history of bilateral eye problems with multiple laser surgeries; blindness in the left eye; chronic lower back pain with degenerative disc disease per history; arthralgias, especially hips, knees, ankles and hands with no imaging available for review; depression; and possible fibromyalgia. (Tr. 445-446) Dr. Bacchus found that Plaintiff should avoid operating heavy or dangerous equipment or working in unprotected heights due to her vision defect. (Tr. 446) Dr. Bacchus found that Plaintiff retained the physical function capacity to perform at least light duties, standing 4-5 hours in a 6-8 hour day, noncontinuous. (Id.)

Plaintiff saw Dr. M. Brill on August 22, 2011. Dr. Brill found that Plaintiff could occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; stand and/or walk for about 6 hours in an 8- hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull is unlimited, other than shown for lift and/or carry. (Tr. 449) Dr. Brill also found that Plaintiff could never climb ladders, ropes, and scaffolds, but occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 45) Dr. Brill also found that Plaintiff needed to avoid all exposure to hazards such as machinery and heights, and she could not perform commercial driving. (Tr. 452) On November 13, 2011. Dr. J. Sands reviewed all the evidence and the decision of Dr. Brill which was affirmed as written. (Tr. 468)

On August 22, 2011, Plaintiff saw Dr. Sherwin Kepes. Plaintiff listed degenerative disc disease, arthritis, bad knees, bad hips, and possible fibromyalgia as her physical disabilities. (Tr. 457) Plaintiff had no health insurance and was receiving her medications through a pharmacy at a discount. (Id.) On a 10-point scale, she rated her pain at a 9. (Id.) In regard to her depression, Plaintiff reported her last treatment was in March 2011, and she reported treatment on two or

three occasions. (Id.) She was currently living with her mother and her daughter, and she was caring for her mother who had Alzheimer's, with some help from her daughter. (Id.) Plaintiff's bedtime varies from 9 p.m. to 12 p.m. (Id.) She does not sleep through the night because of having "too much on my mind." (Id.) When asked how she spends her time, Plaintiff stated that she really does not do very much. (Id.) She gives her mother her medication, feeds her, watches television, and does some cleaning, but she has to do it one room at a time and rest. (Tr. 458) Plaintiff is independent in her bathing. (Id.) She had one friend that she sees, and she is dating. (Id.)

Dr. Kepes noted that Plaintiff's eyes did not converge properly, and she appeared overweight. (Id.) Her affective display was relatively flat and sad. (Id.) Plaintiff reported crying once a day or once every other day. (Id.) She told the doctor that taking care of her mom was overwhelming.(Id.)

Dr. Kepes found that Plaintiff's performance on the mental status exam did not suggest significant issues with her general level of intellectual functioning, and her understanding of arithmetic was adequate. (Tr. 459) He found that she would not need supervision in the management of her funds. (Id.) He found that beyond her physical discomfort she was evidencing signs of depression in the form of anhedonia, sleep difficulties, weight gain, pessimism, low self-esteem, and periodic suicidal ideation. (Id.) Dr. Kepes found that Plaintiff was significantly distressed by the need to care for her mother. (Id.) Dr. Kepes' diagnosis was dysthymic disorder and pain disorder associated with a general medical condition. (Id.) He rated Plaintiff's GAF at 60. (Id.)

Plaintiff saw Dr. Srinivasan Devenathan on August 29, 2012. Plaintiff underwent a

polysomnography. (Tr. 509-510) She was 65 inches tall and weighed 215 pounds for a BMI of 36. (Id.) The doctor noted that apparently Plaintiff had a diagnostic polysomnogram in March of 2011 that showed mild obstructive sleep apnea. (Id.) Plaintiff had returned to the sleep center for a formal trial of continuous positive airway pressure (CPAP). (Id.) Dr. Devenathan recommended that she be offered a formal trial of CPAP at home. (Tr. 510).

In support of a remand of the ALJ's decision, Plaintif first argues that the ALJ improperly evaluated the medical opinions of Dr. David Reinhard. In January of 2012, Dr. Reinhard completed a "Physician's Statement of Ability to Do Work-Related Activities." (Tr. 477-482) He found that Plaintiff could only occasionally lift and carry up to ten pounds but never more than that. Dr. Reinhard made this statement by relying upon x-rays of Plaintiff's back, knee, and hip. (Tr. 477) Dr. Reinhard found that Plaintiff could sit for 15 to 20 minutes at a time and for only two hours out of an eight-hour workday, and stand and/or walk for a maximum of 30 minutes but only for a total of one hour out of an eight-hour workday, because of severe back pain, hip pain, and pain in the feet and paresthesia while standing, with severe back pain when sitting in a normal chair. (Tr. 478) Dr. Reinhard found that in regard to both hands and arms Plaintiff could never reach over head; occasionally reach and handle; occasionally finger and feel; and never push and pull. (Tr. 479)

Dr. Reinhard based his opinion on the findings of tenderness in the thenar eminence on the right hand and tenderness in the left hand at the second metacarpal and index finger. (Id.) Dr. Reinhard found that Plaintiff could never operate foot controls due to paresthesia and pain in her feet. (Id.) Dr. Reinhard further found that Plaintiff could only occasionally climb stairs and ramps, but never climb ladders and scaffolds, balance, stoop, kneel, crouch, and crawl because she was

using a walker to avoid falling. (Tr. 480) Dr. Reinhard also found that Plaintiff had impairments of vision such that she would not be able to avoid ordinary hazards in the workplace, such as boxes on the floor, doors ajar, or approaching people or vehicles because of trouble seeing curves and low lying obstacles. (Id.) Dr. Reinhard based these findings on chronic retraction and scarring of left tympanic membranes. (Tr. 41) He found that Plaintiff had environmental limitations including inability to tolerate exposures to unprotected heights, moving mechanical parts, extreme cold, extreme heat, and vibrations. (Tr. 481) Dr. Reinhard found that Plaintiff could only occasionally tolerate operating a motor vehicle, humidity and wetness, and exposure to dust, odors, fumes, and pulmonary irritants. (Id.) He also found that Plaintiff needed a quiet "library" environment. (Id.) He found that her symptoms would be severe enough to frequently interfere with attention and concentration. (Tr. 482) Plaintiff would need unscheduled breaks every 30 minutes for at least 30 minutes before returning to work. (Id.) She would also need to lie down or rest at unpredictable times up to every hour for about 30 minutes at a time. (Id.) Dr. Reinhard also found that Plaintiff would miss work more than three times a month due to her impairments and/or treatment. (Id.)

The ALJ discounted Dr. Reinhard's opinion for the following reasons:

- The opinion is not supported by his treatment notes or with medical evidence, including the imaging findings (Tr. 21-22);

- The treatment records mainly contain complaints of pain but do not contain objective, examination findings, e.g., straight leg raising testing to support the extreme limitations given in the statement (Tr. 22);

- The opinion actually gives more extreme limitations in terms of sitting, standing, walking than to which Plaintiff testified (Id.); and

- The postural limitations given in the opinion are inconsistent because it is

not clear how Plaintiff can climb ramps and stairs occasionally if she could never balance. (Id.)

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). *See also* 20 CFR § 404.1527(d)(2); Social Security Ruling 96-2p. The ALJ must consider a variety of factors, including whether a physician is a treating or examining physician; the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). *See also* 20 CFR § 404.1527(a)-(d). The ALJ must always explain the reasons for the weight given the opinion of the treating source, and he must not substitute his own judgment for the physician's opinion without relying on other medical evidence or authority in the record. *Clifford v. Apfel*, *Id. See also* 20 CFR § 404.1527(d)(2).

Plaintiff points out that Dr. Reinhard supported his opinion with imaging studies. Specifically, he relied upon x-rays showing osteoarthritis in the back, knee, and hip. (Tr. 477) These lab results can be found in the record along with his treatment notes. (Tr. 362, 364, 366, 368, 369, 373, 374, 375, 376, and 476) In August of 2011, Dr. Reinhard noted that Plaintiff was at a point where she could hardly clean her house without getting completely exhausted and having to stop. (Tr. 461) At the same visit, Dr. Reinhard noted that Plaintiff was having trouble because she was gaining weight, and she could hardly get around anymore at all. (Id.)

Plaintiff also notes that although there were no positive straight leg raising tests in the

exams, there were supportive physical exam findings in Dr. Reinhard's treatment notes. In August of 2010, on physical exam Plaintiff had tenderness across the low back even though she did not have any decreased strength in the lower extremities. (Tr. 320) In October of 2010, she was tender in the lower spinal area. (Tr. 319) In February of 2011, Plaintiff had severe right knee pain with effusion. (Tr. 316) In April of 2011, Plaintiff had a pattern of pain down the legs which appeared radicular as it started in the buttock and went down to the leg, and Plaintiff also had discomfort in both knees. (Tr. 315) In August of 2011, on physical exam, Plaintiff had tenderness in the low back which Dr. Reinhard noted was normal for her, decreased strength in the lower extremities, and tenderness along the calves and the legs. (Tr. 461) At this same appointment, Plaintiff also walked with an antalgic gait because of the hip pain. (Id.) In January of 2012, Plaintiff was very tender in the low back, had quite a bit of achiness in the knees, and her strength was a bit decreased. (Tr. 487)

Plaintiff argues that the ALJ does not analyze and explain why this evidence from the treatment notes and the imaging findings do not support Dr. Reinhard's opinion.

Plaintiff also argues that although the ALJ is correct that her testimony about her limitations on sitting and standing/walking during an 8-hour workday indicated that she could do more than her doctor found, her testimony indicated that she could do much less than the ALJ found. Plaintiff testified that she could stand about two and a half to three hours out of an 8-hour workday and sit for about four to five hours out of an 8-hour workday. (Tr. 55) Dr. Reinhard found that she could sit for about two hours out of an 8-hour workday and stand and/or walk for about one hour. (Tr. 478) However, Dr. Reinhard's opinion on her ability to lift and/or carry were consistent with her testimony and perhaps a little more optimistic. She testified that for the last

six months she could lift less than a gallon of milk. (Tr. 55) But before that she could lift about two liters of milk. (Id.) Dr. Reinhard found that she could lift up to ten pounds occasionally. (Tr. 477) Furthermore, Plaintiff's testimony indicates that she would be limited to essentially sedentary work while the ALJ found that she could perform light work. (Tr. 19) Plaintiff argues that although there are some inconsistencies, this reason is not enough to completely discount the opinion.

Plaintiff also contends that "never balancing" is not inconsistent with "occasionally climbing ramps and stairs." Under SSR 96-9p "balancing" is defined as "maintaining body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically moving surfaces." Under SSR 83-10 "occasionally" is defined as "occurring from very little up to one third of the time." Plaintiff argues that, based on these definitions, Dr. Reinhard's opinion would not be inconsistent with the ability to do "very little" climbing of ramps and stairs especially since stairs and ramps often have guardrails to assist in climbing them.

Next, Plaintiff argues that the ALJ did not evaluate and analyze the "checklist factors" of which at least one favors Dr. Reinhard's opinion. As noted, Dr. Reinhard has a long treatment history with Plaintiff. Thus Plaintiff argues that even if the opinion is not entitled to controlling weight, it should be given great weight. Plaintiff contends that the ALJ failed to analyze this factor and explain why the opinion was not entitled to great weight even if it was not entitled to controlling weight.

The Commissioner, in response, argues that the ALJ properly evaluated the opinion of Dr. Reinhard by citing to laboratory test findings that were mild or negative. However, the ALJ must do more than list the objective evidence seriatim. The ALJ cannot simply offer

his conclusions; he must set forth his interpretations and explain why his interpretations, rather than the doctor's interpretations, are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). *See also* SSR 96-2p ("[T]he notice of determination of decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). In the present case, the ALJ states that Dr. Reinhard's opinion is not supported by the medical evidence, but the ALJ does not explain how the evidence is inconsistent with Dr. Reinhard's opinion.

The Commissioner contends that neither Dr. Reinhard nor the Plaintiff suggested which x-rays support which particular claimed limitation. But this is not absolutely necessary. In the "controlling weight" part of the ALJ's determination, the issue is whether the medical opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. It is not necessary that the opinion be fully supported by such evidence. SSR 96-2p. Whether a medical opinion is well-supported will depend upon the facts of each case, and it is a judgment that adjudicators must make based on the extent to which the opinion is supported by medically acceptable clinical and laboratory diagnostic techniques and requires an understanding of the clinical signs and laboratory findings in the case record and what they signify. SSR 96-2p. The ALJ is to check the doctor's opinion and the medical evidence of record. If the doctor's opinion is not given controlling weight, then the checklist factors are reviewed. *See* 20 CFR §§ 404.1527(d), 416.927(d). One of these factors is supportability which focuses on the evidence presented to support the opinion, particularly medical signs and laboratory findings and the explanation the

source provides. *See* 20 CFR 404.1527(d)(3), 416.927(d)(3).

The Commissioner claims that the ALJ correctly found that the objective evidence was lacking as the evidence cited by Plaintiff was not objective evidence. However, it is clear that tenderness, effusion, strength, and antalgic gait are all objective evidence, as they all can be observed. Even the complaints of pain are objective evidence. Under SSR 96-4p symptoms such as pain, when they are manifestations of an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical diagnostic techniques, are a medical "sign" rather than a "symptom." In the present case the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. (Tr. 20) Therefore, Plaintiff's complaints of pain were "signs" and constitute objective evidence. The ALJ made no explanation of why these signs did not, in the ALJ's estimation, support Dr. Reinhard's opinion. This court agrees with Plaintiff that the ALJ was required to fully analyze Dr. Reinhard's opinion and explain fully why the opinion was not given, at the least, great weight. Thus, a remand is in order.

Next, Plaintiff argues that the ALJ failed to evaluate her mental impairments along with her physical impairments in combination in determining her RFC. An ALJ cannot ignore the combined effect of a claimant's ailments on his or her ability to work. *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006). The ALJ considered Plaintiff's psychiatric problems and found them not disabling, and then considered her physical problems and found them not disabling, but the ALJ ignored the possibility that the combination was disabling.

The Commissioner contends that the ALJ considered the combined effects of all of Plaintiff's problems and considered whether Plaintiff met a listing. But the Plaintiff's argument

was about the RFC and not the listings. The RFC is what the claimant can still do despite his medical impairments. *See* 20 CFR §§ 404.1545(a)(1), 416.945(a)(1). A listing is a different finding, and it is a determination of whether a claimant meets certain criteria for a particular medical impairment which would lead to a finding of disabled. *See* 20 CFR Pt. 404, Subpt. P, App. 1. *See Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006). As there is no indication that the ALJ considered Plaintiff's combined impairments when determining her RFC, remand is proper on this basis also.

Next, Plaintiff argues that the ALJ improperly failed to include any limitations in the RFC related to her hearing impairments. When an ALJ poses a hypothetical question to a vocational expert, the question must include all limitations supported by medical evidence in the record. *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). In February of 2011, Dr. Reinhard found on physical exam that although Plaintiff's right tympanic membrane was normal, the left showed yellow liquid, and he diagnosed otitis externa and probably otitis media. (Tr. 315) In April, 2011, Plaintiff continued to have a chronic recurrent problem with left ear drainage. (Id.) On physical exam she had chronic tympanic membrane perforation with quite a bit of yellow drainage. (Id.) In January of 2012, Plaintiff continued to have problems with her left ear, and on physical exam her left tympanic membrane showed chronic changes with a little bit a fluid in the canal, but no obvious perforation. (Tr. 487)

Dr. Reinhard found that in regard to environmental limitations Plaintiff was limited to an environment that was "quiet (library)." (Tr. 481) Thus, he limited her to the least noisy environment as the other choices were "moderate (office)," "loud (heavy traffic)," and "very loud (jack-hammer)." (Id.) All three of the occupations cited by the ALJ to support her Step 5

finding would expose Plaintiff to noise levels higher than she is capable of withstanding. Under the SCO there are five categories of noise intensity level which are numbered one through five. US Department of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO). ID-2 (1993).These levels are as follows:

1=Very Quiet, such as isolation booth for hearing tests; deep sea diving; forest trail.
2=Quiet such as library; many private offices; funeral receptions; golf course; art museum
3=Moderate such as business office where typewriters are used; department store; grocery store; light traffic; food restaurant at off-hours
4=Loud such as can manufacturing departments; large earth-moving equipment; heavy traffic
5=Very loud such as rock concert-front row; jack-hammer work; rocket engineering testing area during tests

The small parts assembler (DOT #706.684-022) is performed in a level 4 environment. The small product assembler (DOT #739.687-030) is performed in a level 3 or moderate environment for noise, and the sub-assembler (DOT #729.684-054) is performed the same noise level as small product assembler. Hence, there is no evidence supporting the ALJ's Step 5 finding if the noise level is limited to two.

The Commissioner argues that the ALJ observed at the hearing that Plaintiff had no difficulties with hearing. But the ALJ and Dr. Reinhard are referring to different kinds of limitations. The ALJ is referring to difficulty understanding what other people say. In fact, Dr. Reinhard agrees with the ALJ that Plaintiff can understand simple oral instructions and communicate simple information and use the telephone. (Tr. 480) The limitation that Dr. Reinhard found was noise, which is an environmental limitation. (Tr. 481) This limitation involves the intensity level of noise to which a worker would be exposed in a job environment which is

described by different levels. U.S. Department of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO) D-2 (1993). As this limitation was not adequately considered in Plaintiff's RFC, this point should also be taken up during remand.

Lastly, Plaintiff contends that the ALJ improperly failed to include any limitations in the RFC related to her eyesight impairments. Dr. Reinhard found that Plaintiff had visual limitations in that she has trouble seeing curves and low lying obstacles. (Tr. 480) Dr. Anh-Danh Phan found in June of 2011 that Plaintiff had chronic poor vision of the left eye and high myopia. (Tr. 378) The ALJ found that Plaintiff had left eye blindness for which she limited Plaintiff to no exposure to unprotected heights, commercial driving, or hazardous machinery. (Tr. 16 and 19) The VE testified that an individual who had vision in only one eye and therefore depth perception problems could not perform the work as small parts assembler and small products assembler. (Tr. 72) As the RFC does not fully take into account Plaintiff's visual limitations, remand is ordered on this basis also.

Conclusion

On the basis of the foregoing, the decision of the Commissioner is hereby REMANDED for proceedings consistent with this Opinion.


Entered:   April 21, 2015.

                                        s/ William C.  Lee
                                        William C. Lee, Judge
                                        United States District Court